XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
BERNARD A. ESKANDARI (SBN 244395)
Supervising Deputy Attorney General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013
 Tel: (213) 269-6348
 Fax: (213) 897-4951
 Email: bernard.eskandari@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA** ex rel. Xavier Becerra, Attorney General of California,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF EDUCATION** and **MITCHELL ZAIS**, in his official capacity as Acting Secretary of Education,<br><br>Defendants. | Case No. 21-cv-00384<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

## INTRODUCTION

1.      In one of its last—of many—regulatory giveaways to the proprietary-school industry over the last four years, the U.S. Department of Education ("ED") has again issued regulations that illegally roll back federal oversight of for-profit schools to the detriment of students and taxpayers.

2.      As the country faces the COVID-19 pandemic, more and more Americans are

1

enrolling in distance-based higher education. For-profit schools that primarily operate online are seeing an explosion of enrollments. There are reports that for-profit schools are dramatically increasing their marketing budgets to capitalize on the misfortune of those that are struggling and vulnerable as the pandemic decimates segments of the economy.

3.    Despite this, more than six months into the pandemic, on September 2, 2020, ED finalized new "Distance Education and Innovation" regulations, effective immediately, which substantially ease federal oversight of for-profit schools in violation of the Administrative Procedure Act ("APA"). California specifically challenges two provisions in the new regulations.

4.    First, under the new regulations, a school is now automatically certified to receive federal funds if ED does not act on the school's certification application within 12 months. This is an abdication of federal oversight that runs afoul of the Higher Education Act, which mandates that the Secretary affirmatively certify that a school has the administrative capability and financial responsibility to receive federal funds, among other critical statutory requirements. One key reason for delayed action on an application is where a predatory institution is under extended investigation by a state attorney general. Accordingly, this new provision is a potential regulatory windfall to predatory institutions, allowing them to evade important ED oversight

5.    Second, the new regulations rescind an Obama-era cap on the amount of instruction a for-profit school can outsource to a school under common ownership. In 2010, ED determined that a 50% cap was appropriate to protect students from bait-and-switch tactics employed by for-profit schools by ensuring that the institution in which the student enrolled provides the majority of the instruction. The new regulations irrationally rescind this common-sense protection, allowing for-profit schools to now outsource 100% of a student's education.

6.    At a historic time when ED should be increasing federal oversight to protect students from unscrupulous for-profit schools, ED has shamefully attempted to do the opposite. However, in its haste to provide an eleventh-hour regulatory bonanza to for-profit schools in the waning days of the Trump administration, ED has once again violated the APA.

**JURISDICTION AND VENUE**

7.    This action arises under the APA, 5 U.S.C. §§ 553, 701-706. This Court has

2

subject-matter jurisdiction over this action because it is a case arising under federal law, 28 U.S.C. § 1331. This Court may issue the declaratory relief sought. 28 U.S.C. §§ 2201-2202.

8.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the People of the State of California reside in this district and no real property is involved in this action.

## INTRADISTRICT ASSIGNMENT

9.     Assignment to the San Francisco Division is appropriate because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this division. Civil L.R. 3-2(c). Among other events, a number of for-profit colleges have campuses in the counties of San Francisco, Alameda, and San Mateo. Programs offered at these campuses and the students that enroll in them are substantially affected by the challenged agency action at issue in this case. Moreover, the People of the State of California and ED maintain offices in the county of San Francisco.

## PARTIES

10.     The People of the State of California ("California" or "People") bring this action by and through their Attorney General, Xavier Becerra, California's chief law officer. Cal. Const. art. V, § 13.

11.     Defendant the United States Department of Education is an executive agency of the United States government. Its principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

12.     Defendant Mitchell Zais is the Acting Secretary of Education and is being sued in his official capacity. His official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

### I.   THE HIGHER EDUCATION ACT AND FOR-PROFIT SCHOOLS

13.     Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 et seq., authorizes federal student-assistance programs that provide financial aid to students that enroll in eligible education programs at eligible postsecondary institutions of higher education (a "school" or an "institution").

3

14.     Each year, ED provides billions of dollars in Title IV aid in the form of federal loans, work-study, and grants. In fiscal year 2019, for example, ED provided more than $120 billion to, or on behalf of, students.[1]

15.     Title IV aid provides critical assistance to students and fosters access to higher education.

16.     ED administers multiple student-loan programs under Title IV, including the Federal Family Education Loan Program and the William D. Ford Direct Student Loan Program. These loan programs are important for students who otherwise would not be able to afford the cost of higher education and could not meet the underwriting standards of private lenders.

17.     Federal student loans are central to the business models of for-profit schools.

18.     For-profit schools (also referred to as "proprietary" institutions) are private businesses that attempt to generate profits for their owners and shareholders by primarily offering vocational programs.

19.     For-profit schools are ultimately accountable by law for the returns they produce for shareholders.

20.     For-profit schools receive the vast majority of their revenue from federal sources, including Title IV. For example, in 2009, the 15 publicly traded, for-profit education companies received 86% of their revenues from federal sources.[2]

21.     Students who attend for-profit schools are, with alarming frequency, unable to repay their education debt. For example, according to figures released by ED, in fiscal year 2016, more than 15% of students who attended for-profit schools defaulted on their federal student loans, compared to 9.6% of students who attended public schools and 6.6% of students who

---

[1] Federal Student Aid, *FY 2019 Annual Report*, Nov. 15, 2019, http://studentaid.ed.gov/sa/sites/default/files/FY_2019_Federal_Student_Aid_Annual_Report_Final.pdf.

[2] U.S. Senate, Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, at 24 (July 30, 2012), http://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf ("Senate Report").

attended private nonprofit institutions. Defaults by students who attended for-profit schools accounted for 32.6% of all federal student-loan defaults in fiscal year 2016, despite accounting for only 21% of all borrowers entering repayment.[3]

22.     More than 98% of the fraud complaints received by ED are from students that attended a for-profit school.[4]

23.     ED estimates that for-profit schools are seven times more likely to engage in misconduct than public and other nonprofit institutions. *E.g.*, 83 Fed. Reg. 37,297-98 (Table 5).

24.     Despite the fact that for-profit schools are largely dependent on taxpayer-funded sources, these schools are excessively expensive for the students who attend them. Programs at for-profit schools typically cost 4.5 times more than comparable programs at a community college.[5] The tuition charged by for-profit schools is often a product of the school's profit goals rather than anticipated academic and instructional expenses.[6]

25.     At the same time, for-profit schools spend relatively little on education. For example, in fiscal year 2009, prominent for-profit schools spent only 17.2% of their revenue on instruction, less than the amount allocated for marketing, advertising, recruiting, and admissions staffing, and less than the amount generated as profit.[7]

26.     For-profit schools typically advertise to students with modest financial resources. Many of these students are the first in their families to seek higher education. For-profit schools in many instances direct their marketing toward low-income and minority students, particularly low-income women of color and veterans. Additionally, for-profit schools target individuals who are unemployed and thus eligible for federal workforce-retraining monies, as well as veterans

---

[3] Federal Student Aid, *Comparison of FY 2016 Official National Cohort Default Rates to Prior Two Official Cohort Default Rates* (Aug. 4, 2019), http://www2.ed.gov/offices/OSFAP/defaultmanagement/schooltyperates.pdf.

[4] The Century Foundation, *For-Profit Colleges Continue to Generate Most Loan Relief Claims* (June 25, 2019), http://tcf.org/content/commentary/profit-colleges-continue-generate-loan-relief-claims/.

[5] College Board, *Trends in College Pricing 2016*, at 9, http://files.eric.ed.gov/fulltext/ED572539.pdf.

[6] Senate Report at 3.

[7] Senate Report at 5-6.

who are eligible for federal veterans' benefits.

27.     Federal authorities have long recognized that for-profit schools are prone to abusing their access to taxpayer-funded Title IV aid at the expense of low-income, unsophisticated students.

28.     For example, in 1988, William J. Bennett, Secretary of Education under President George H.W. Bush, called on Congress "to curb the 'shameful and tragic' abuse of student financial-aid programs by proprietary schools," noting that the abuse "is an outrage perpetrated not only on the American taxpayer but, most tragically, upon some of the most disadvantaged, and most vulnerable members of society . . . ."[8] Secretary Bennett denounced the "exploitative and deceitful practices" of for-profit schools, citing "falsified scores on entrance exams, poor-quality training, and harsh refund policies," among other abuses.[9]

29.     In 1990, the U.S. Senate Permanent Subcommittee on Investigations found that the federal student-loan program, "particularly as it relates to proprietary schools, is riddled with fraud, waste, and abuse, and is plagued by substantial mismanagement and incompetence" and that the program failed "to insure that federal dollars are providing quality, not merely quantity, in education."[10] The report noted widespread victimization of vulnerable students by for-profit schools:

> [M]any of the program's intended beneficiaries—hundreds of thousands of young people, many of whom come from backgrounds with already limited opportunities—have suffered further . . . . Victimized by unscrupulous profiteers and their fraudulent schools, students have received neither the training nor the skills they hoped to acquire and, instead, have been left burdened with debts they cannot repay.[11]

30.     Institutions receive the benefit of accepting tuition payments from students receiving Title IV aid, regardless of whether those students are ultimately able to repay their

---

[8] Robert Rothman, "Bennett Asks Congress to Put Curb on 'Exploitative' For-Profit Schools," Education Week (Feb. 17, 1988), http://www.edweek.org/ew/articles/1988/02/17/07450039.h07.html.

[9] Id.

[10] Abuses in Federal Aid Programs, Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, 102nd Cong., 1st Sess., Report 102-58, at 6, 33, http://files.eric.ed.gov/fulltext/ED332631.pdf.

[11] Id. at 33.

loans. Accordingly, both schools and their education programs must meet an array of statutory and regulatory eligibility requirements to participate in Title IV aid.

## II.  ED'S 2020 "DISTANCE LEARNING AND INNOVATION" REGULATIONS

31.     On April 2, 2020, ED published a notice of proposed rulemaking regarding "Distance Learning and Innovation," with the stated goal of "reduc[ing] barriers to innovation in the way institutions deliver educational materials and opportunities to students, and assess[ing] their knowledge and understanding, while providing reasonable safeguards to limit the risks to students and taxpayers." 85 Fed. Reg. 18,638.

32.     ED published final "Distance Learning and Innovation" regulations ("DLI Rule") on September 2, 2020, with an effective date of July 1, 2020. However, the Secretary designated the DLI Rule for early implementation. 85 Fed. Reg. 54,742-43.

33.     At issue here are two provisions of the DLI Rule that reduce federal oversight of for-profit schools and violate the APA.

### A.     The DLI Rule's "Automatic-Certification Provision" Violates the APA

34.     The HEA requires the Secretary to affirmatively certify that an institution is eligible to participate in Title IV student-aid programs. *See generally* 20 U.S.C. § 1099c.

35.     To request certification, an institution submits "a single application form" prescribed by ED. 20 U.S.C. § 1099c(b). If approved, the Secretary may certify that an institution is eligible to participate "for a period not to exceed 6 years." 20 U.S.C. § 1099c(g). Prior to the expiration of an institution's period of participation, the institution may request recertification. *Id*.

36.     Whether an institution requests initial certification or recertification, the Secretary's statutory review is the same. Specifically, for a school to be eligible to participate in Title IV student-aid programs, "the Secretary shall determine the legal authority to operate within a State, the accreditation status, and the administrative capability and financial responsibility of [the school.]" 20 U.S.C. § 1099c(a). Under no circumstance can an institution be automatically certified or recertified.

37.     In contravention of the HEA, the DLI Rule includes a provision that allows for automatic recertification. Under the DLI Rule, a school is now automatically recertified for Title

7

IV eligibility, if the Secretary's required statutory review of the school's application takes longer than 12 months ("Automatic-Certification Provision"):

> In the event that the Secretary does not make a determination to grant or deny certification within 12 months of the expiration date of [an institution's] current period of participation, the institution will automatically be granted renewal of certification, which may be provisional.

34 C.F.R § 668.13(b)(3).

38.    In addition to violating the HEA, ED also failed to follow the basic procedural requirement under the APA of providing a reasoned explanation for the Automatic-Certification Provision, 5 U.S.C. § 706(2)(A), including, for example, the following deficiencies:

39.    ED stated that there is "uncertainty experienced by institutions in cases where the [recertification] decision period is lengthy." 85 Fed. Reg. at 18,663. ED, however, provided no evidence of this supposed "uncertainty" and made no inquiry into the impact on students beyond the bare acknowledgment that "[c]ertification decisions can have major implications for . . . students." 85 Fed. Reg. 54,776.

40.    ED entirely failed to consider an important aspect of the problem by ignoring the fact that extended recertification decisions are often necessary for predatory schools due to their failure to comply with standards of administrative capability or financial responsibility, or due to a pending law-enforcement action against the school brought by a state attorney general. ED did not consider that these are precisely the schools that should not benefit from automatic recertification.

41.    ED failed to consider significant alternatives, including, for example, that additional staff could be hired to more promptly review and act on recertification applications; that recertification could be "automatically" provisional, rather than "for cause" only, 85 Fed. Reg. 18,663; or that automatic recertification could occur after an application has been pending for 24 or 36 months, rather than 12 months.

42.    ED selected an arbitrary figure and failed to adequately support its choice that pending recertification applications should be automatically granted after 12 months.

43.    ED failed to explain or even identify how long the period of eligibility would be

8

1    for an institution granted automatic recertification.

2        44.    ED did not meaningfully address the fact that automatic recertification violates the

3    Secretary's statutory obligations under the HEA.

4        **B.    The DLI Rule's "100%-Outsourcing Provision" Violates APA**

5        45.    Under the DLI Rule, for-profit schools may now enter a written agreement to

6    outsource 100% of an education program to a school under common ownership ("100%-

7    Outsourcing Provision"). 34 C.F.R § 668.5(a)(2).

8        46.    This means that a student can now enroll in and receive a credential from an

9    institution that provided none of the education for which the credential was conferred.

10       47.    The 100%-Outsourcing Provision applies only to for-profit schools. ED has

11   previously stated that outsourcing agreements do not apply to "either public or private, non-profit

12   institutions [because] such institutions are not owned or controlled by other entities and generally

13   act autonomously." 75 Fed. Reg. 34,855.

14       48.    The 100%-Outsourcing Provision repeals and replaces ED's 2010 rule that

15   protected students by limiting to 50% the amount of an educational program that a for-profit

16   school could outsource. 34 C.F.R § 668.5(a)(2) (2012).

17       49.    ED previously took the position that the 50% cap was critical for a number of

18   reasons, including, among others, (a) "ensur[ing] that the institution providing most of the

19   program will be the one associated with the students that are taking the program," 75 Fed. Reg.

20   66,870; (b) preventing for-profit schools from "circumvent[ing] regulations governing cohort

21   default rates and '90-10' provisions . . . by having one institution provide substantially all of a

22   program while attributing the title IV revenue and cohort default rates to the other

23   commonly[]owned institution," 75 Fed. Reg. 34,814; and (c) preventing "campus-based

24   institutions [from being] used as 'portals' to attract students for online institutions . . . where

25   students may not have expected the program to be offered by a different institution," *id*.

26       50.    To justify rescission on the 50% cap, ED explained that the cap was "needlessly

27   restrictive" because "each institution must meet the criteria to be an eligible institution." 85 Fed.

28   Reg. 18,659. While ED acknowledged that outsourcing could be "misused" by institutions, ED

9

posited that "written arrangements beyond 50 percent theoretically could be used responsibly," but "defer[red] to accrediting agencies in this area," "encourage[ing] accrediting agencies to . . . be wary of [outsourcing agreements] if they merely serve as a lifeline to institutions that could not otherwise meet the accrediting agency's requirements for fiscal and administrative capacity (or other standards) . . . ." 85 Fed. Red. 54,772-74. ED further stated that it "d[id] not believe" that rescission of the 50% cap, "which applies to a very small subset of institutions and students, exposes those students to meaningful additional risk and note[d] that any misrepresentation or fraud . . . may be addressed through existing enforcement means." 85 Fed. Red. 54,774.

51.     In repealing and replacing the 50% cap on outsourcing, ED failed to follow the basic procedural requirement under the APA of providing a reasoned explanation for the 100%-Outsourcing Provision, 5 U.S.C. § 706(2)(A), including, for example, the following deficiencies:

52.     ED relied on a number of unsupported assumptions and generalizations that amount to wishful thinking and abstract theorizing offered in a vacuum. *See, e.g.*, 85 Fed. Red. 54,772 ("written arrangements beyond 50 percent *theoretically* could be used responsibly") (emphasis added).

53.     ED did not support key factual assertions with research, studies, or evidence, including ED's "belie[f]" that outsourcing "applies to a very small subset of institutions and students" and does not "expose[] those students to meaningful additional risk." 85 Fed. Reg. 54,774.

54.     ED failed to consider the extent to which the regulatory change would allow for-profit schools to evade or circumvent statutory and regulatory requirements that protect students and taxpayers, including the "90-10 rule," 20 U.S.C. § 1094(a)(24), 34 C.F.R. § 668.28; the "85-15 rule," 38 U.S.C. § 3680A, 38 C.F.R. § 21.4201; and limitations on cohort default rates, 20 U.S.C. § 1085, 34 C.F.R. § 668.187.

55.     ED did not explain its departure from its prior position that the 50% cap was necessary to protect students and failed to provide a reasoned explanation for disregarding facts and circumstances that underlay or were engendered in the prior policy.

56.     ED selected an arbitrary figure, 100%, and failed to adequately support its choice

10

and respond to substantial criticism.

### III. THE CHALLENGED PROVISIONS HARM CALIFORNIA'S PUBLIC COLLEGES AND UNIVERSITIES

57.     The Automatic-Certification Provision and the 100%-Outsourcing Provision (together, "Challenged Provisions") both cause concrete and particularized injury to California by directly and indirectly harming California's public colleges and universities.

58.     California's public colleges and universities are competitors to for-profit schools.

59.     The mission of California's public colleges and universities is set by statute. California Education Code § 66010.2 states that the California Community Colleges, the California State University, and the University of California "share goals designed to provide educational opportunity and success to the broadest possible range of our citizens . . . ."

60.     California's public colleges and universities specifically compete for and seek to serve prospective and enrolled students of for-profit schools and, in particular, students who have been defrauded by for-profit schools.

61.     For example, restoring access to higher education for those who need it is a major system priority for California Community Colleges. On September 21, 2015, the Board of Governors of the California Community Colleges requested an additional $175 million in funding in 2016-17 for increased access for approximately 70,000 students. The request was specifically made to accommodate additional, expected enrollments from veterans returning from Iraq and Afghanistan, and the closure of several for-profit schools, including Corinthian.

62.     California has an interest in promoting opportunities for education in California's public colleges and universities and in deterring predatory schools, including for-profit schools, from unfairly competing with them.

63.     Institutions of higher education are economic actors that compete with each other in an education market to enroll students. There is strong competition for students across public and private sectors at the sub-baccalaureate college levels—i.e., between public community colleges and for-profit schools.

64.     In particular, the California Community Colleges positions itself as an alternative

1    to and a competitor of for-profit schools.

2         65.    With more than 2.1 million students at 115 colleges, the California Community

3    Colleges is the largest system of higher education in the nation. The California Community

4    Colleges provides students with the knowledge and background necessary to compete in today's

5    economy. With a wide range of educational offerings, the colleges provide workforce training,

6    basic courses in English and math, certificate and degree programs, and preparation for transfer to

7    four-year institutions.

8         66.    The California Community Colleges is an economic actor with an annual budget

9    of over $10 billion.

10        67.    The Challenged Provisions deregulate and ease federal oversight of the

11   proprietary-school industry. For example, the Automatic-Certification Provision allows predatory

12   institutions to qualify for automatic Title IV recertification if the Secretary is unable to act on the

13   institution's application within 12 months. Additionally, the 100%-Outsourcing Provision

14   rescinds the 50% cap on the amount of instruction a for-profit school can outsource to a school

15   under common ownership.

16        68.    Because of the Challenged Provisions, students will enroll in schools and

17   programs that would otherwise be inaccessible due to Title IV ineligibility. These students are

18   diverted from enrolling in California's public colleges and universities, including the California

19   Community Colleges.

20        69.    The California Community Colleges, as well as other California public colleges

21   and universities, will face increased competition by for-profit schools and programs that would

22   otherwise be inaccessible to students if not for the Challenged Provisions.

23        70.    In addition, the financial well-being of the State and the mission of California's

24   system of public education are harmed by the Challenged Provisions.

25        71.    The Challenged Provisions impair the educational mission of California's public

26   colleges and universities. For example, it is within the mission of California's public colleges and

27   universities to enroll a "diverse and representative student body," with "[p]articular efforts . . .

28   made with regard to those who are historically and currently underrepresented in both their

12

graduation rates from secondary institutions and in their attendance at California higher educational institutions." Cal. Educ. Code § 66010.2.

72.     For-profit schools advertise to students with modest financial resources. Many are the first in their families to seek higher education. Many for-profit schools deliberately target low-income and minority residents with deceptive information about their programs and enroll them in programs that are unlikely to lead to employment that would allow them to repay the high costs of tuition.

73.     As a result, low-income and minority residents are often the primary victims of school misconduct that federal oversight prevents.

74.     Students of color account for more than half of undergraduate enrollment at for-profit schools and are disproportionately impacted by the high-cost, low-quality programs offered by for-profit schools.[12]

75.     Because of the Challenged Provisions, diverse and underrepresented students will be diverted from California's public colleges and universities and enroll in for-profit schools and programs that would otherwise be inaccessible due to Title IV ineligibility. The inability to enroll these students harms the educational mission of California's public colleges and universities, as well as causes financial loss from the lost enrollment of these students.

76.     The loss of these students also harms California by depriving the State of the opportunity to hire them through the Federal Work-Study Program. 20 U.S.C. § 1087-51–1087-58. Employers eligible under the Federal Work-Study Program include, among others, California's public colleges and universities, as well as California state agencies. 20 U.S.C. § 1087-51(c). The program encourages students to participate in community-service activities and engenders in students a sense of social responsibility and commitment to the community. 20 U.S.C. § 1087-51(a). Financial aid through the Federal Work-Study Program mutually benefits both eligible students and eligible employers. Students benefit by earning money to help with

_____

[12] National Center of Education Statistics, *A Profile of the Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions* (Feb. 2017), http://nces.ed.gov/pubs2017/2017416.pdf.

their educational expenses. Employers benefit by receiving a subsidy from the federal government that, in most cases, covers more than 50% of the student's wages. In some cases, such as for reading or mathematics tutors, the federal share of the wages can be as high as 100%.

77.     Because of the Challenged Provisions, students will enroll in programs at for-profit schools that would otherwise be inaccessible, and California's public colleges and universities, as well as California state agencies, will be unable to hire these students.

## IV.    THE CHALLENGED PROVISIONS HARM CALIFORNIA'S FISC

78.     The Challenged Provisions cause concrete and particularized injury to California by directly and indirectly harming California's fisc.

79.     The California Student Aid Commission ("CSAC") administers state financial-aid programs for students attending public and private universities, colleges, and vocational schools in California. CSAC's central mission is to make education beyond high school financially accessible to all Californians. Among other things, CSAC administers the Cal Grant program, a state-funded program that provides need-based grants to California students.

80.     The Cal Grant program is the largest source of California-funded student financial aid.

81.     Cal Grant spending has more than doubled over the past decade. Cal Grant spending increased from $1 billion in 2009-10 to $2.6 billion in 2019-20.

82.     For a school to qualify to receive Cal Grants, that school must, among other things, be a "qualified institution" under federal law, 34 C.F.R. § 600 et seq., which means that it is institutionally eligible to participate in Title IV. *See* Cal. Code Regs. tit. 5, § 30009. Accordingly, state law incorporates federal law to determine which schools qualify to receive Cal Grants.

83.     Each year, California expends substantial funds in the form of Cal Grants to support students that attend programs at for-profit schools.

84.     When California, through the Cal Grant program, pays some or all of a student's costs to attend a low-quality program offered by a for-profit school, California is harmed. California's interest is in investing in beneficial higher-education programs, not programs that leave students with poor job prospects, worthless degrees, and unrepayable debt.

14

85.     The reduced federal oversight caused by the Challenged Provisions means that California will expend substantial funds in Cal Grant aid to support students who attend or will attend programs at for-profit schools that would be inaccessible to students if not for the Challenged Provisions.

86.     Further, additional CSAC funds will be expended to support students who attended a low-quality program accessible because of the Challenged Provisions and who will then need to seek additional job training or education.

## V.     THE CHALLENGED PROVISIONS HARM CALIFORNIA'S QUASI-SOVEREIGN INTEREST

87.     The Challenged Provisions cause concrete and particularized injury to California by directly and indirectly harming its "quasi-sovereign" interests in the health and well-being— both physical and economic—of its residents.

88.     In particular, California's interests include avoiding economic harm to California student-borrowers; ensuring the well-being of its citizens, including through the promotion of their education; protecting consumers; and regulating education at all levels within the state.

89.     Efforts by for-profit schools to take advantage of and defraud low-income, vulnerable students seeking to better themselves through education impacts a substantial portion of California's population.

90.     Tens of thousands of Californians have already enrolled in low-quality programs offered by for-profit schools. They hold hundreds of millions of dollars in federal student-loan debt.[13]

91.     Individual California students will suffer concrete harm as a result of the Challenged Provisions. ED recognizes, for example, that the 100%-Outsourcing Provision could "of course, be misused" by "serv[ing] as a lifeline to institutions that could not otherwise meet the accrediting agency's requirements for fiscal and administrative capacity (or other standards) . . . ." 85 Fed. Reg. 54,772.

---

[13] The Institute for College Access and Success, *How Much Did Students Borrow to Attend the Worst-Performing Career Education Programs?* (Aug. 2018), http://ticas.org/files/pub_files/ ge_total_debt_fact_sheet.pdf.

92.     Education is critical to the future of California.

93.     Postsecondary education is an integral aspect of living and working in California.

94.     Funding education is one of the most important functions performed by the State. In 2016-17, higher education was the third largest General Fund expenditure, receiving $14.6 billion in resources, which accounted for 11.9% of General Fund resources. The majority of California's higher-education funding was divided among California's three postsecondary education systems: University of California, California State University, and California Community Colleges.

95.     States have historically been the primary regulators of higher education. Over time, the federal government's role in the regulation of higher education has increased.

96.     In particular, the HEA increased the role of the federal government in postsecondary education, primarily by creating the system of loans, subsidies, and grants that fund higher education to this day.

97.     California is a member of the "triad" of actors—the federal government, state governments, and accreditors—that currently regulate postsecondary education. One of the State's primary roles in the triad is consumer protection.

98.     California's consumer-protection laws regulate commerce in California and apply to for-profit schools. *See, e.g.*, Cal. Bus. & Prof. Code § 17200 et seq.[14] The State is charged with enforcing California's consumer-protection laws and ensuring that these laws are uniformly and adequately enforced. California has a sovereign and quasi-sovereign interest in ensuring consumer protection within its borders. California also has a quasi-sovereign and parens patriae interest in protecting the health, safety, and welfare of its residents.

99.     The People have a strong interest in the regulation of postsecondary schools within its borders. Federal law, including the DLI Rule, has a significant impact on the regulation of these schools because of student reliance on federal financial aid.

---

[14] *See also, e.g.*, *Attorney General Kamala D. Harris Obtains $1.1 Billion Judgment Against Predatory For-Profit School Operator* (Mar. 23, 2016), http://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-obtains-11-billion-judgment-against-predatory.

100.    Robust federal oversight of schools and programs is a key protection afforded to prospective and enrolled students against predatory institutions and low-quality programs.

101.    Federal financial aid plays a significant role in access to education within California.

102.    California has a tangible interest in the health, safety, and welfare of its residents, which are threatened both directly and indirectly by the Challenged Provisions.

103.    The Challenged Provisions have substantial direct and indirect effects that harm the well-being of California residents, California's public colleges and universities, and other state interests.

104.    The California Attorney General has taken a leading role among law-enforcement agencies in addressing the abuses of the for-profit school industry.

105.    In response to widespread institutional misconduct, California has initiated numerous investigations and enforcement actions against proprietary and for-profit schools for violations of California consumer-protection statutes. This includes, for example, an enforcement action against Corinthian Colleges, Inc., resulting in a $1.1 billion default judgment (San Francisco Sup. Ct. Case No. CGC-13-534739, compl. filed Oct. 10, 2013), and a pending enforcement action against Ashford University, LLC (San Diego Sup Ct. Case No. RG17883963, compl. filed Nov. 29, 2017).

106.    Through these investigations and enforcement actions, California has uncovered a wide array of predatory practices employed by abusive for-profit schools. These practices commonly include unfair and harassing recruitment tactics; false and misleading representations to consumers and prospective students designed to induce their enrollment; the recruitment and enrollment of students unable to benefit from the education sought; and the creation, guarantee, and funding of predatory, private student loans.

107.    In addition to pursuing these investigations and enforcement actions against for-profit schools, California has expended considerable state funds and resources to assist students affected by institutional misconduct in obtaining federal student-loan forgiveness.

## CLAIM 1

## AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW

## AND IN EXCESS OF STATUTORY AUTHORITY

108.    California incorporates by reference the foregoing paragraphs.

109.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations . . . ." 5 U.S.C. § 706(2)(A), (C).

110.    The DLI Rule is a final agency action.

111.    The DLI Rule's Automatic-Certification Provision contravenes 20 U.S.C. § 1099c(a).

112.    Accordingly, the Automatic-Certification Provision is not in accordance with law and in excess of statutory authority in violation of 5 U.S.C. § 706(2)(A), (C).

## CLAIM 2

## AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, OR

## OTHERWISE NOT IN ACCORDANCE WITH LAW

113.    California incorporates by reference the foregoing paragraphs.

114.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

115.    ED failed to follow the basic procedural requirement of providing a reasoned explanation for the Challenged Provisions.

116.    Among other deficiencies, ED's explanation relies on assumptions and generalization unsupported by data, studies, or evidence; fails to address the substance of prior findings; fails to explain its departure from prior positions; fails to consider significant alternatives; fails to meaningfully address potential HEA violations; fails to consider important aspects of the problem; relies on speculation, conjecture, and wishful thinking; and engages in abstract theorizing offered in a vacuum.

117.    Accordingly, the Challenged Provisions are arbitrary, capricious, or otherwise not

1  in accordance with law in violation of 5 U.S.C. § 706(2)(A).

2  **DEMAND FOR RELIEF**

3  California respectfully requests that this Court enter a judgment in its favor and grant the

4  following relief:

5  A. Declare that the Challenged Provisions violate the APA;

6  B. Hold unlawful, set aside, and vacate the Challenged Provisions; and

7  C. Grant other relief as the Court deems just and proper.

8

9  Dated: January 15, 2021                    Respectfully submitted,

10                                             XAVIER BECERRA
                                              Attorney General of California
11

12

13                                             BERNARD A. ESKANDARI
                                              Supervising Deputy Attorney General
14

15                                             *Attorneys for Plaintiff the People of the State*
                                              *of California*
16

17

18

19

20

21

22

23

24

25

26

27

28