BRIAN M. BOYNTON
Acting Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch
KATHRYN L. WYER (Utah Bar No. 9846)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** ex rel. Xavier Becerra, Attorney General of California,<br><br>Plaintiff,<br>**v.**<br><br>**UNITED STATES DEPARTMENT OF EDUCATION** and **MIGUEL CARDONA**, in his official capacity as the United States Secretary of Education,<br><br>Defendants. | Case No. 3:21-cv-384-JD<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>**Date: July 15, 2021**<br>**Time: 10:00 a.m.**<br>**Courtroom: 11** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ...............................................................................................1

ARGUMENT ................................................................................................... 2

    I.      The State Identifies No Cognizable Injury Traceable to the Challenged Provisions................................................................................................. 2

        A.      The State's Theory of Competitor Standing Is Deeply Flawed................. 2

        B.      The State Fails To Show Cognizable Harm to Its Educational Mission..... 6

        C.      The State Fails To Show a Cognizable Fiscal Injury ................................ 7

        D.      The State Lacks a Quasi-Sovereign Interest That Supports Its Standing ... 8

    II.     The State Cannot Satisfy Redressability................................................ 10

CONCLUSION.............................................................................................. 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### TABLE OF AUTHORITIES

## CASES

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ............................................................3

*Am. Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145 (D.C. Cir. 1977) .........................5

*Ardente, Inc. v. Shanley*, No. 07-4479, 2010 WL 546485 (N.D. Cal. 2010) .................................8

*Asarco Inc. v. Kadish*, 490 U.S. 605 (1989) ............................................................10

*Aziz v. Trump*, 231 F. Supp. 3d 23 (E.D. Va. 2017) ....................................................9

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .......................................................8

*California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017) .........................8, 9

*California v. U.S. Dep't of Educ.* ("*California II*"),
       No. 17-cv-7106, 2019 WL 7669767 (N.D. Cal. Mar. 4, 2019) .......................................7

*Challenge v. Moniz*, 218 F. Supp. 3d 1171 (E.D. Wash. 2016) ..........................................9

*Cheever v. Huawei Device USA, Inc.*,
       No. 18-CV-06715-JST, 2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) ............................6, 9

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ....................................................5

*Clinton v. City of New York*, 524 U.S. 417 (1998) .......................................................3

*Colorado v. EPA*, 989 F.3d 874 (10th Cir. 2021) ........................................................8

*Ctr. for Biological Diversity v. Exp.-Imp. Bank*, 894 F.3d 1005 (9th Cir. 2018) .......................10

*Estate of Saunders v. Comm'r*, 745 F.3d 953 (9th Cir. 2014) ...........................................6

*Havasupai Tribe v. Provencio*, 906 F.3d 1155 (9th Cir. 2018) ..........................................2

*Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944 (9th Cir. 2017) ..............2

*La. Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) ...................................2

*Lopez v. Bank of Am., N.A.*,
       No. 20-CV-04172-JST, 2020 WL 7136254 (N.D. Cal. Dec. 4, 2020) ...............................3

*Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13 (D.D.C. 2020),
       *vacated as moot*, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020) ................................8, 9

iii

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............................................................1, 9

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ...............................................................1

*Navajo Nation v. De'pt of the Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017) ...............6

*New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002) .....................................5

*Papasan v. Dometic Corp.*, No. 16-CV-02117, 2017 WL 4865602 (N.D. Cal. Oct. 27, 2017)......5

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam) ....................................8

*Petro–Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) ...........................8

*Planned Parenthood v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100 (9th Cir. 2020) ....2

*Regents v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018),
     *vacated in part*, 140 S. Ct. 1891 (2020) ............................................................7

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ..............................................................4

*Territory of Am. Samoa v. Nat'l Marine Fisheries Serv.*,
     No. CV 16-00095, 2017 WL 8316931 (D. Haw. Aug. 10, 2017) .......................9

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) .......................3

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ......................................9

*Washington v. Trump*, 858 F.3d 1168 (9th Cir. 2017) ...............................................6, 7


**STATUTES**

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ...........................*passim*

5 U.S.C. § 553 ...................................................................................................................8

5 U.S.C. § 702 ...................................................................................................................9

Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.* ........................*passim*

20 U.S.C. § 1099a ..............................................................................................................2

Cal. Educ. Code § 84750.4 ...............................................................................................3

California Private Postsecondary Education Act of 2009, Cal. Educ. Code §§ 94800 *et seq*. .......5

**ADMINISTRATIVE MATERIALS**

Dep't of Educ., Final regulations, 84 Fed. Reg. 58834, 58843 (Nov. 1, 2019) .............................5

Dep't of Educ., Final regulations, 85 Fed. Reg. 54742 (Sept. 2, 2020) ("2020 Rule") ........ *passim*

34 C.F.R. § 668.13 ..........................................................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

The Department is committed to protecting students and regulating schools, including proprietary schools. However, the State of California (the "State") fails to establish its standing to challenge two provisions of a 2020 final rule revising the Department's regulations under Title IV of the Higher Education Act ("HEA") related to distance education, *see* 85 Fed. Reg. 54742 (Sept. 2, 2020) ("2020 Rule"). The first provision (the "Automatic Renewal Provision") addresses schools' Title IV eligibility renewal applications that have been pending for more than a year, replacing month-to-month extensions of the schools' certifications with automatic renewals that are subject to conditions imposed at the Secretary's discretion. The second provision (the "Common Ownership Provision") removes a requirement that the school granting a student's degree provide more than 50 percent of the educational program if the school was part of a group of schools under common ownership or control. In its opposition, the State concedes that neither provision will affect Title IV eligibility but continues to speculate that these provisions will somehow channel students from public to proprietary schools, reducing State school enrollments. This bald conjecture defeats the State's standing on causation grounds.

Moreover, the State fails to support its various theories of harm. The equation of reduced enrollments with economic or financial harm is a fallacy. The State's own laws and public statements, not to mention its own declarant, make clear that higher enrollments at State schools would cost the State more money, not less. The State fails to identify concrete, particularized competitive injury, nor does it justify application of the competitive standing doctrine to a market where the State itself is a primary regulator, subsidizing tuition at the State's own schools, such that the playing field was never equal to begin with. The State also fails to support an interest in increasing diversity of its own enrollments at the expense of other schools within its borders. Nor does the State overcome the fact that its choice to tie its Cal Grant funds to Title IV eligibility makes any resulting injury self-inflicted.

Nor does the State support its invocation of *parens patriae* standing despite the bar imposed by *Massachusetts v. Mellon*, 262 U.S. 447 (1923). The circumstances that the Court later considered in *Massachusetts v. EPA*, 549 U.S. 497 (2007), are not present here, where the

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
Case No. 3:21-cv-384-JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

State brings suit under the Administrative Procedure Act ("APA") and identifies no effect on its quasi-sovereign territorial interests. The Court therefore should dismiss the State's claims in their entirety for lack of standing.

## ARGUMENT

## I.     The State Identifies No Cognizable Injury Traceable to the Challenged Provisions

### A.  The State's Theory of Competitor Standing Is Deeply Flawed

Defendants' opening brief explains that competitor standing doctrine is inapplicable here because the State is in no way similar to a prospective bidder for government contracts, *see Planned Parenthood v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020), or a private competitor for market share in a regulated product or service, *Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 951 (9th Cir. 2017). Def. Mem. at 7-8. Although the State presses this theory of standing in its opposition, it identifies no other case that recognized competitor standing in a context like this one, where a state claims that a federal regulation gives private entities an advantage—not in any contest before the federal government itself, but in a market where the state exerts its own regulatory authority, and purchasing decisions are made by independent third parties. Indeed, the State's focus on an alleged competitive injury suggests its claims fall outside the relevant zone of interests. *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (plaintiff's environmental interests fell outside Mining Act's zone of interests). Nothing in 20 U.S.C. § 1099a, cited by the State, Pl. Opp. at 6, which identifies a state's responsibility in its regulatory capacity to provide information to the Department, suggests that Congress had any particular concern with furthering any proprietary interest a state might have in competing with non-state schools for students.

The State suggests that its competitor standing theory only requires a showing that the Department has "lift[ed] regulatory restrictions on [the State's] competitors," Pl. Opp. at 9 (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)), and that "causation is 'implicit,'" *id.* (quoting *Planned Parenthood*, 946 F.3d at 1108). The Supreme Court, however, has rejected such a "boundless theory of standing" and has instead required a

plaintiff to identify "an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).

Here, the State fails to establish that the consequence it posits—a reduction in State school enrollments—would qualify as a concrete injury even assuming it would occur. Competitive standing doctrine presumes that some economic benefit to the plaintiff is at stake— whether a government contract or grant, or market share in a product or service. *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998). But the State fails to show that higher enrollments at State schools would confer an economic benefit on the State. Indeed, the State offers no meaningful rebuttal to the fact that higher State school enrollments cost the State more. The State asserts that State schools' funding depends on enrollments, Pl. Opp. at 10 (citing Hetts Decl. [ECF 27-1] ¶¶ 42-45)—but most of that enrollment-tied funding is provided by the State itself.[1] *See* Hetts Decl. ¶¶ 23, 28-29, 34, 43. The State thus provides its schools with budgetary subsidies that make community colleges "on average, significantly less expensive [to students] than for-profit schools," Hetts Decl. ¶ 19, but by the same token, higher enrollments necessarily require an increase in State budgetary allocations. *Cf. id.* ¶¶ 23, 34 ("public funding cuts" led to decreased State school enrollments in the past). The State asserts that it "compete[s] for federal grants and subsidies," but the only federal money it identifies is student financial aid such as Pell Grants and work study funds, Pl. Opp. at 9, which a student might receive and might then use for tuition. The possibility that some portion of a student's tuition may be covered by federal aid does not change the fact that, on balance, higher enrollments cost the State more.[2]

---

[1] *See* Cal. Educ. Code § 84750.4; Cal. Legislative Analyst's Office, The 2020-2021 Budget: California Community Colleges, at 6, https://lao.ca.gov/reports/2021/4372/Community-Colleges-021621.pdf (State subsidizes community colleges based on "per-student funding rates"). The Court can take judicial notice of this material. Fed. R. Evid. 201(b); *Lopez v. Bank of Am., N.A.,* No. 20-CV-04172-JST, 2020 WL 7136254, at *5 (N.D. Cal. Dec. 4, 2020).

[2] The State cites *Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015), *as revised* (Nov. 25, 2015), to argue standing is "not an 'accounting exercise.'" Pl. Opp. at 10. But *Texas* acknowledged that benefits may offset costs when, as here, they "are of the same type" (State costs versus State income) "and arise from the same transaction" (student enrollment). *Texas*, 809 F.3d at 155.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
Case No. 3:21-cv-384-JD

With respect to causation, the State fails to show its asserted injury is "fairly traceable" to either of the challenged provisions, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)—much less does it meet the heightened burden applicable where independent third parties are involved, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). The State claims, in vague, conclusory fashion, that the challenged provisions "loosen regulatory controls on for-profit schools," which, it posits, will in turn allow proprietary schools to "better compete to enroll students, which in turn diverts students from enrolling" in State schools. Pl. Opp. at 8. But the State asserts no facts to support these broad assertions or to show either challenged provision will impact proprietary school enrollments at all, much less State school enrollments. Certainly, the Department did not suggest any such impacts in its rulemaking. *See* 85 Fed. Reg. at 54776, 54793, 54799 (cited by State). The State's declarant identifies a few instances in the past where lower enrollments in State schools have coincided with higher enrollments in proprietary schools, and vice versa. Hetts Decl. ¶¶ 17, 23-24. But such assertions fail to suggest causation, nor do they suggest in any way that the provisions challenged here would affect enrollments in either category.

Implicit in the State's theory is that the two challenged provisions would affect proprietary schools' Title IV eligibility, upon which, the State asserts, such schools rely. Compl. ¶¶ 20, 68. But the State concedes that the Automatic Renewal Provision—which on its face applies to all schools, not just proprietary schools—will not impact a school's Title IV eligibility; even absent that provision, a school would receive month-to-month extensions of its certification while its application was pending. Def. Mem. at 8-9 (citing 34 C.F.R. § 668.13(b)(2)); Pl. Opp. at 8. The only impact that the State identifies, then, is reduced "uncertainty" from not having to rely on month-to-month extensions. *Id.*[3] But even if automatic renewal confers some benefit on

---

[3] The State also asserts that ten proprietary schools in California will "immediately" be recertified under this provision because their applications have already been pending for a year. Pl. Opp. at 8. However, the State cites no authority for the notion that the Department has applied or would attempt to apply the provision retroactively. In any event, all ten of these schools continue to be Title IV-eligible on a month-to-month basis. Despite the overstated language in its introduction, Pl. Opp. at 1, the State does not suggest in its argument that automatic renewal will require the Department to overlook evidence of misconduct or the existence of a state or accreditor investigation, nor could it. Nothing in the challenged provisions

proprietary schools, the State has not identified any link between that benefit and students' enrollment choices. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (rejecting competitor standing that "depend[ed] on the independent actions of third parties" and thus was unlike "the 'garden variety competitor standing cases'" where the chain of causation is "'firmly rooted in the basic law of economics'"); *Am. Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 150 (D.C. Cir. 1977) (plaintiffs' claim of competitive harm was "too speculative to support standing" where customers "might for a variety of reasons continue to prefer" competitors even if plaintiffs prevailed).

Nor has the State explained how rescinding the 50% cap on outsourcing educational programs, even if it "deregulates for-profit schools," Pl. Opp. at 8, makes those schools more attractive to students in comparison to State schools. Again, the State offers nothing, in response to Defendants' argument, *see* Def. Mem. at 9, to show any impact of that provision on a school's Title IV eligibility, effectively conceding the point. *Papasan v. Dometic Corp.*, No. 16-CV-02117, 2017 WL 4865602, at *18 (N.D. Cal. Oct. 27, 2017) (construing silence as a concession).

Also relevant to causation is the fact that the State itself is the primary regulator of all schools—whether State or proprietary—within its borders. *E.g.*, California Private Postsecondary Education Act of 2009, Cal. Educ. Code §§ 94800 *et seq*. Indeed, the State in its sovereign capacity has established the budgetary structure through which State schools are funded while only schools "legally authorized by a State" may be eligible for Title IV in the first place. *See* 34 C.F.R. § 600.9(a)(1)(i)(A) (school must be "established . . . by a State through a charter statute, constitutional provision, or other action issued by an appropriate State agency or State entity"); 84 Fed. Reg. 58834, 58843 (Nov. 1, 2019) ("if the institution is physically located in or operating in a given State, the State has the authority to determine, for the purpose of State authorization, how that institution will be authorized by the State"). The "playing field"

---

"reduce[s] the Department's enforcement power." *See* 85 Fed. Reg. at 54776 (identifying Department's authority to make certification provisional or to issue sanctions, if warranted).

here is thus largely one of the State's own design. The Court should reject the State's theory of competitor standing.

**B.   The State Fails To Show Cognizable Harm to Its Educational Mission**

The State's assertion of an injury to its "educational mission" also fails to establish its standing. As discussed in Defendants' opening brief, the Ninth Circuit's analysis of states' proprietary interest in the diversity of their faculty and students in *Washington v. Trump*, 847 F.3d 1151, 1160–61 (9th Cir. 2017), on which the State relies in its opposition, does not apply here because the State does not allege an impact on identifiable State school faculty or students. *See* Def. Mem. at 7. Rather, it proposes a far more attenuated impact, suggesting that proprietary schools "target" and "disproportionately enroll" individuals who "would otherwise support the educational mission" of State schools, and concluding that lower enrollments at proprietary schools could thus lead to higher enrollments of such students at State schools. Pl. Opp. at 10-11. The State fails to identify any facts supporting a concrete and particularized proprietary injury on this basis fairly traceable to the challenged provisions. Indeed, the State effectively concedes that it cannot meet regular Article III requirements by invoking the relaxed standard of a procedural rights claim. Pl. Opp. at 11 (asserting a "reasonably probable threat" (quoting *Navajo Nation v. De'pt of the Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017)). Yet the State fails to refute Defendants' argument that a procedural rights analysis is inappropriate, Def. Mem. at 11-15, mentioning the issue only in passing in a footnote, *see* Pl. Opp. at 6 n.1. This lack of meaningful response amounts to a concession that a procedural rights analysis does not apply. *Cheever v. Huawei Device USA, Inc.*, No. 18-CV-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) ("'Arguments raised only in footnotes . . . are generally deemed waived' and need not be considered." (quoting *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014))).

Moreover, under either standard, a plaintiff must show "a likelihood that the challenged action, if ultimately taken, would threaten a plaintiff's interests." *Navajo Nation*, 876 F.3d at 1161. Here, the notion that the challenged provisions will have any impact at all on the diversity of State schools' overall student bodies is wholly speculative, again relying on the unsupported notion that the challenged provisions might increase proprietary school enrollments, and might

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
Case No. 3:21-cv-384-JD

thus in turn reduce State school enrollments among students in particular categories. Both of these possibilities also rely on hypothetical future enrollment choices of unknown individuals of particular ethnic or socioeconomic status. Again, the situation here is a far cry from that in *Washington*, where the plaintiff states had identified specific noncitizen faculty or students as unable to enter the country. *Washington*, 847 F.3d at 1159-60.

The State also relies on *Regents v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018), *vacated in part*, 140 S. Ct. 1891 (2020). But there, the state plaintiffs identified numerous concrete injuries that would undoubtedly result from the defendant agency's rescission of DACA. *Id.* at 1033-34. Unlike here, the notion that an identifiable group—DACA recipients—would be less likely to enroll in State schools when they had lost work authorizations and faced the threat of deportation was hardly speculative. *See id.* And the asserted injury in *Regents* was that an identifiable category of prospective students would not enroll at all; unlike here, there was no need to speculate about how students would choose between State and proprietary schools. *See id.* The State thus fails to establish standing on this basis.

### C.   The State Fails To Show a Cognizable Fiscal Injury

The State next asserts a fiscal injury, but its alleged loss of tuition dollars does not qualify as an injury for the same reasons explained above. The State cites *California v. U.S. Dep't of Educ.,* No. 17-CV-7106, 2019 WL 7669767 (N.D. Cal. Mar. 4, 2019), which concluded, without discussion, that a financial injury from lost enrollments was a matter of "common sense," *id.* at *7, but the Court here may take judicial notice of material that demonstrates otherwise, *supra* Part I.A & n.1, and the State concedes as much in its filing. *See* Pl. Opp. at 11 (conceding that lower enrollments lead to "reduced state funding," meaning that the State spends less); Hetts Decl. ¶¶ 23, 29, 34, 43 (describing how lower State expenditures result in enrollment losses while higher enrollments require higher State expenditures).

The State also claims a second fiscal injury in the form of "wasted expenditures" on Cal Grants awarded to students attending proprietary schools. As discussed in Defendants' opening brief, this theory also relies on the speculative premise that the challenged provisions would save proprietary schools from losing Title IV eligibility. Def. Mem. at 10. The State's silence on this

issue in opposition effectively concedes the premise is flawed and that no cognizable injury is at issue. *Ardente, Inc. v. Shanley*, No. 07-4479, 2010 WL 546485, at *6 (N.D. Cal. 2010).

Moreover, the fact that the State intentionally ties its Cal Grant criteria to Title IV eligibility means that any such injury is also self-inflicted, "break[ing] the causal chain." *See Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13, 35 (D.D.C. 2020), *vacated as moot*, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020). As discussed in Defendants' opening brief, the situation here directly parallels that in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam). The State's attempt to distinguish *Pennsylvania* fails because the situation here is precisely that identified in *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), as implicating *Pennsylvania*. Here, as in *Pennsylvania*, the State has "directly and explicitly tied [its] finances" in the form of Cal Grant expenditures "to another sovereign's laws"—specifically Title IV. *Id.* at 574. The State fails to explain how this Court could ignore such on point analysis simply because *Pennsylvania* analyzed the Supreme Court's original jurisdiction rather than Article III standing. *Cf. Colorado v. EPA*, 989 F.3d 874, 888 & n.2 (10th Cir. 2021) (rejecting similar argument); *Petro–Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, R.B., J.) (self-inflicted injuries cannot support Article III standing); *Maryland,* 474 F. Supp. 3d at 40–41 (rejecting states' similar claims). The Court's reasoning applies here and requires the conclusion that the State's injury here is self-inflicted and cannot support its standing.

### D.   The State Lacks a Quasi-Sovereign Interest That Supports Its Standing

As explained in Defendants' opening brief, settled law precludes the State from invoking *parens patriae* standing against the United States. Def.  Mem. at 5-6. The State protests that the law on this issue is not settled, Pl. Opp. at 13, but its cited authorities fail to support a state's standing to sue the federal government under the APA based solely on its interest in protecting the health and welfare of its citizens. In *California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017), the court did not accord the state *parens patriae* standing—where a state would be "merely a 'nominal party.'" *Id.* at 822. Rather, it held that the state there had identified a cognizable financial injury sufficient to pursue a procedural claim that the defendant agency had violated the notice and comment requirement in 5 U.S.C. § 553. *California*, 281 F. Supp. 3d

at 822. And *Challenge v. Moniz*, 218 F. Supp. 3d 1171 (E.D. Wash. 2016), did not involve an APA claim but instead a claim under an environmental statute, which the court held was similar to the Clean Air Act at issue in *Massachusetts v. EPA*, 549 U.S. 497, in authorizing a state to bring suit. *Challenge*, 218 F. Supp. 3d at 1179.

The State suggests applying the *Mellon* bar here would be inconsistent with *Massachusetts v. EPA*, and it cites three cases from other districts that suggested the bar may not apply to suits challenging agency, rather than congressional, action. Pl. Opp. at 13 n.3. But as the court in *Maryland* explained when rejecting similar arguments, the state plaintiff in *Massachusetts v. EPA* had identified an injury "in its capacity as a landowner" and sought to protect its quasi-sovereign interest in its territory. *Maryland*, 474 F. Supp. 3d at 38. Moreover, the state had brought suit under the Clean Air Act, which provided states with a procedural right. *Id.* In both *Maryland* and this case, however, no "cognizable nonsovereign injury" is at stake, and no quasi-sovereign interest in a state's territory is at stake. *Id.* at 39. Nor is this a procedural rights case, as discussed in Defendants' opening brief and above. *See* Def. Mem. at 11.

The State's only attempt to refute this point is again relegated to a footnote, *see* Pl. Opp. at 14 n.4, and thus should be disregarded. *Cheever*, 2019 WL 8883942, at *3. Moreover, the court in *Maryland* correctly rejected the notion that the APA's cause of action allows state *parens patriae* suits. As the court explained, the APA "never explicitly mentions a state or state agency, much less expressly authorizes a state or state entity to sue the federal government in their role as parens patriae." *Maryland*, 474 F. Supp. 3d at 44. To the contrary, the APA requires that a plaintiff itself have "suffer[ed] legal wrong," which rules out a state seeking to rely solely on its interest in protecting the health and welfare of its citizens. *Id.* (quoting 5 U.S.C. § 702).[4]

---

[4] The three cases cited by the State misread *Massachusetts*, and their reasoning is flawed when compared to that in *Maryland*. In addition, these cases are distinguishable. *See Aziz v. Trump*, 231 F. Supp. 3d 23, 32 (E.D. Va. 2017) (addressing constitutional claims); *Territory of Am. Samoa v. Nat'l Marine Fisheries Serv.*, No. CV 16-00095, 2017 WL 8316931, at *5 (D. Haw. Aug. 10, 2017) (holding plaintiff's claim analogous to that in *Massachusetts* because plaintiff state sought to assert its own rights under Magnuson-Stevens Fishery Conservation and Management Act); *Texas v. United States*, 328 F. Supp. 3d 662, 698 (S.D. Tex. 2018) (applying flawed reasoning with respect to APA claims but noting that there was no dispute over causation). This Court should follow *Maryland* rather than these cases.

1
2
3
4
5
6
7

In addition to the State's failure to identify a cognizable injury to a quasi-sovereign interest, the causation problems identified above apply here as well. The State fails to establish any likelihood that the challenged provisions would cause the asserted harm to the State's residents. As discussed above, there is no basis to assume that the challenged provisions would save any proprietary school that would otherwise have lost Title IV eligibility, and any other impact that the State might seek to identify is entirely speculative. The Court therefore should reject the State's attempt to invoke *parens patriae* standing.

8

## II.    The State Cannot Satisfy Redressability

9
10
11
12
13
14
15
16
17
18
19
20
21

The State devotes a separate section to redressability, suggesting that Defendants have not challenged that aspect of standing. Pl. Opp. at 14. However, causation and redressability "are two sides of the same coin." *Ctr. for Biological Diversity v. Exp.-Imp. Bank*, 894 F.3d 1005, 1012 n.2 (9th Cir. 2018). Particularly where a causal link between a plaintiff's asserted injury and the object of its challenge is lacking, it is clear that the injury would not be redressed by the court's favorable decision. That is certainly the case here, given the attenuated nature of the connection between the State's asserted injuries and the challenged provisions as well as the fact that students are independent third parties who may take numerous factors into account when deciding whether to attend a State or proprietary school. *Cf. Asarco Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (redressability is not met when it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"). The State therefore fails to satisfy the redressability prong of standing as well.

22

## <u>CONCLUSION</u>

23
24

For the foregoing reasons and those set forth in Defendants' opening brief, Defendants' motion to dismiss should be granted.

25
26
27
28

DATED:  May 25, 2021                    Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
Case No. 3:21-cv-384-JD

MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
KATHRYN L. WYER (Utah Bar No. 9846)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
Case No. 3:21-cv-384-JD